**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GORTZ ENTERPRISES, INC., *et al.*** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 25-7000** |
| | : | |
| **MDR UNITED LLC, *et al.*** | : | |

**McHUGH, J.** **October 8, 2026**

**MEMORANDUM**

This is a fraud and breach of contract case involving the sale of roofing business franchises. Defendant MDR United, LLC ("MDR") claimed to have a proprietary business model that would allow inexperienced franchisees to make triple the industry average profit with minimal time commitment. Plaintiffs are franchisee business entities whose founders bought multiple franchises from MDR. Plaintiffs claim that MDR lacked the infrastructure to provide the support it had promised them, and that they were shown fraudulent and misleading financial projections by MDR's officers, Individual Defendants Josh Skolnick, Tanner Hamby, and Thomas "Turp" Ricketts. When Plaintiffs brought this action, Defendants responded with this Motion to Dismiss, citing multiple layers of purported releases and several threshold issues. For the reasons that follow, the Motion will be granted in part and denied in part.

## I. Facts as Pled

MDR is a company headquartered in Pennsylvania. *See* Compl. ¶ 5. Despite allegedly having no experience in the roofing industry, MDR claimed to have a unique, "proprietary" business model. *Id.* ¶ 14. MDR sold this business model in the form of "Mighty Dog Roofing" franchises, promising prospective franchisees that they could earn "profit margins nearly triple the industry average." *Id.* ¶¶ 14, 26.

From 2021 to 2023, MDR's founder, Josh Skolnick, and founding officers Tanner Hamby and Turp Ricketts (together, "Individual Defendants") contacted the individual owners of the Plaintiff companies and sold them multiple roofing franchises in the Plaintiffs' respective home states. *Id.* ¶ 25. Defendants told Plaintiffs that "the franchise was designed for semi-absentee ownership," requiring only about ten hours per week, and that "it wanted franchisees who had little to no experience in roofing." *Id.* ¶ 26.

In their discussions, Defendants presented two documents that claimed to project the financial prospects they could expect from the new franchises. One was a "unit economics workbook" ("Workbook"), a Microsoft Excel spreadsheet that purported to project the profits they could expect. *Id.* ¶¶ 27-28. The other document was a Financial Disclosure Document (FDD) mandated by Federal Trade Commission rules. *See id.* ¶ 29. FDDs require franchisors to clearly state their management and ownership structure, litigation history, financial position, and, crucially, financial statements and expected cost to franchisees, all in an effort to give potential franchisees a clear picture of what they are getting into. *See id.* ¶¶ 15-24.

After being given the workbook and the FDDs, each of the Plaintiffs bought multiple franchises from MDR, each one conveying exclusive territory in the Plaintiffs' home states. Plaintiff Bauer bought four territories, Plaintiff Peterson bought three territories, and Plaintiff Gortz's founders, Francesca Gortzounian, Daniel Turner, and Herbert Turner, bought a combined six territories. *See* Compl. ¶¶ 50–52. As these sales proceeded, each Plaintiff signed a series of documents, including a franchise agreement for each territory and an assignment from the individual franchisee to the corporate aliases that now serve as Plaintiffs. *See id*; *see also id.* ¶ 12 n.1 (noting that the Plaintiff companies are owned by the individuals who founded them).

Sometime after becoming franchisees, each plaintiff asserts that MDR failed to provide the support they promised to provide in the franchise agreements. *See id.* ¶¶ 53-54. This included advertising, lead generation, and digital marketing help. *See id.* Without promised help from their supposedly experienced franchisor, Plaintiffs found "[t]he actual costs and operational realities of the franchise provided were dramatically different from Defendants' oral and written representations, resulting in significant losses." *Id.* ¶ 57.

Plaintiffs also found that their financial performance fell well short of the windfalls promised in MDR's pre-sale workbooks and FDDs. The FDDs, which were supposed to represent the franchisees' expected performance, instead showed costs from two Mighty Dog outlets that had extensive subcontracting relationships, did not employ sales or production managers, and had prior experience in the roofing business. *See id.* ¶ 30. The FDDs also showed EBITDA margins that were, according to Plaintiffs, "more than triple what is achievable in the roofing industry" by excluding relevant, essential costs that Franchisees would be required to incur under the franchise agreements. *Id.* ¶ 31.[1] Defendants also allegedly omitted material data from every other franchisee operating other than the two unusual ones, distorted financial data from one of those representative outlets, and similarly misrepresented franchise performance data on several other items of the FDDs. *See id.* ¶¶ 34-47. Similar selective and misleading numbers allegedly pervaded the unit economics Workbooks, presented to Plaintiffs by Ricketts and Hamby during the sales process. *See id.* ¶ 28.

[1] For example, the FDD showed an outlet that had $0 of payroll "because it was owner-operated and had no employees." *Id.* ¶ 31.

On December 12, 2025, Plaintiffs brought this action, alleging common law claims of fraudulent and negligent misrepresentation, breach of contract, and state consumer-protection claims in Plaintiffs' home states of Tennessee, Ohio, and Virginia. *See generally id.* ¶¶ 60-103.

## II. Standard of Review

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1), (2), and (6). As to the challenge to subject-matter jurisdiction under Rule 12(b)(1), the controlling authority is provided by *In re BPS Direct, LLC; Cabela's, LLC Wiretapping Litig.*, 175 F.4th 423 (3d Cir. 2026). As to the challenge to personal jurisdiction under Rule 12(b)(2), the controlling authority is provided by *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007). As to the remainder of the motion under Rule 12(b)(6), the controlling authority is provided by *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

### A. Threshold Issues and General Releases

Defendants' Motion primarily focuses on threshold issues, including numerous layers of aggressive releases that Defendants say bar almost any feasible legal actions against them. Only one of Defendants' threshold issues warrant any action: the fact that three of Gortz's six Franchise Agreements require arbitration as a precondition to litigation.

#### *1. Plaintiffs have standing.*

Defendants first claim Plaintiffs lack standing to bring this Action. Mot. at 16-17, ECF 17. As a matter of Pennsylvania law, they argue that any harm was done to the Plaintiffs' individual founders; when those founders assigned their rights in the franchises to the Plaintiff-businesses, they could not transfer standing for harms done to the individuals before the transfers. *See id.*

Second, Defendants point out that the assignment agreements contain a provision purporting to waive any claims the assignors may have held against the Defendants. *Id.*

Defendants' principal state-law support is the Pennsylvania Supreme Court's 1910 decision of *Sensenig v. Pennsylvania Railroad Co.*, which held that an individual's tort claim for harm done to him personally could not be assigned to another natural person. *See* 78 A. 91, 91-92 (Pa. 1910). But in the 116 years since *Sensenig*, the Pennsylvania Supreme Court has clarified that the harms of many business-related torts *can* be assigned to a legitimate successor because such rights "are more akin to property rights." *Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 359 (Pa. 1988). Courts applying this provision have allowed assignments for such intangible injuries as legal malpractice, *see Ammon v. McCloskey*, 655 A.2d 549, 551-52 (Pa. Super. Ct. 1995) and baseball players' rights of publicity, *see MLB Players Inc. v. DraftKings, Inc.*, 771 F. Supp. 3d 513, 531-32 (E.D. Pa. 2025).

Defendants ignore this modern distinction and attempt to group this case with cases based on physical injuries to individuals, which fall outside the modern carve-out for business property rights. *See, e.g., Feingold v. Tesone*, No. 12-4695, 2012 WL 3956662, at *3 (E.D. Pa. Sept. 7, 2012), *aff'd*, 548 F. App'x 39 (3d Cir. 2013) (holding that plaintiff, a disbarred attorney, could not pursue personal injury claims he contractually acquired from actually injured previous plaintiffs). In general, Pennsylvania has a clear policy that the recipient of a valid assignment "stands in the shoes of the assignor" and receives the assignor's right to bring a cause of action. *Smith v. Cumberland Group Ltd.*, 687 A.2d 1167, 1172 (Pa. 1997). Given how Pennsylvania courts have treated assignment of business claims, I am persuaded that the Pennsylvania Supreme Court would allow small businesses to be assigned causes of action first held by their lead officers and nearly

sole proprietors. *See MDR United, LLC v. Flex Nine Exteriors, Inc.*, No. 25-5073, 2026 WL 1984115, at *7-8 (E.D. Pa. July 9, 2026).

*2. The agreements' collective action waivers do not bar this action.*

Defendants also argue that the Plaintiffs' franchise agreements require each of them to bring any actions against MDR individually, and that they may not pursue this action jointly. *See* Mot. at 10. Bauer's agreement, for example, says:

> **18.9.2** Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

ECF 1-3 at 52. I am not convinced that the language of this provision bars this Action. First, there is a spectrum of different litigation arrangements separating class actions, consolidated actions, and actions brought by single plaintiffs, and each of the terms used has a particular definition. "Consolidated" actions, for example, are cases that were first brought separately before being combined into a single case. *See Hagan v. Rogers*, 570 F.3d 146, 161 (3d Cir. 2009) (comparing consolidation under Rule 42(a) with joinder under Rule 20). Here, Plaintiffs bring this action on behalf of themselves alone and have litigated this case together from the start, so this action is neither a class action nor a consolidated case.

If MDR meant to bar any litigation other than cases brought separately by single plaintiffs, the agreement should have so provided. On a motion to dismiss, a district court must consider all facts in the light most favorable to the plaintiff and only dismiss claims if the complaint and essential documents do not entitle the Plaintiff to relief under any plausible reading. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Defendants' collective action waiver, as written, does not meet that standard.

*3. This Court has personal jurisdiction over the individual defendants.*

Defendants' next argument is that the Complaint does not show sufficient contacts with Pennsylvania to assert personal jurisdiction over the Individual Defendants Skolnick, Hamby, Ricketts, and Hoffmann. *See* Mot. at 11. Defendants point out that neither the Plaintiffs nor the Individual Defendants are citizens of Pennsylvania and none of their bargaining and performance took place in this Commonwealth. *See id.* Defendants correctly recite that "[a] federal court sitting in diversity applies the personal jurisdiction law of the forum state, subject to the requirements of federal due process." *Id.* (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007)).

In this case, personal jurisdiction exists based on a well-established doctrine in Pennsylvania that "'an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable' for the tortious activity." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 105 n.13 (3d Cir. 2001) (quoting *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983)). To assess personal jurisdiction for a Pennsylvania corporation's out-of-state officers, courts consider factors including "the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the alleged tortious conduct." *Maleski by Taylor v. DP Realty Tr.*, 653 A.2d 54, 63 (Pa. Commw. Ct. 1994). Jurisdiction over an officer may be appropriate where the officer was a "key player in the corporate structure," *Rittenhouse & Lee v. Dollars & Sense, Inc.*, No. 83-5996, 1987 WL 9665, at *5 (E.D. Pa. Apr. 15, 1987), or where the officer had "apparent authority to commit the corporation to contracts and to represent the corporation in contractual discussions and obligations," *Elbeco Inc. v. Estrella de Plato Corp.*, 989 F. Supp. 669, 677 (E.D. Pa. 1997).

Based on this provision, the Complaint provides ample basis for asserting personal jurisdiction over the Individual Defendants. Skolnick is MDR's founder and CEO, and the franchise agreements attached to the Response by Defendants detail his key role in leading the business.[2] *See, e.g.*, ECF 17-7 at 11-12. The Complaint claims that he wrote the allegedly misleading workbooks that form the basis for the fraud claims against him. *See* Compl. ¶ 47. Ricketts was another founding officer of MDR, and the Complaint alleges he worked on the fraudulent documents and presented the workbooks to two of the plaintiffs. *See id.* ¶ 28 n.2; *see also* ECF 17-7 at 11-12. The same is true of Hamby, who served as a founding officer and presented the workbook to the remaining plaintiff. *See* Compl. ¶ 28 n.2; *see also* ECF 17-7 at 11-12. The pleadings plausibly allege the kind of personal involvement by key officers in a Pennsylvania corporation's alleged torts that may permit personal jurisdiction over those officers.

Defendants' arguments otherwise are unconvincing. Their main supporting authority is a Third Circuit case saying that corporate officers are not "automatically" availed in company's actions. Mot. at 11 (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998)). *Kiekert* involved the defendant German corporation attempting to stop an Italian corporation from merging with another company. The New Jersey plaintiff contended that the German company's indirect contacts with the plaintiff rendered the German company liable to jurisdiction in New Jersey. The Third Circuit concluded there had been no German incursion into New Jersey that

[2] While a district court is usually barred from considering material other than the pleadings and documents appended to them, it can "consider documents integral to or explicitly relied upon in the complaint or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 178 (3d Cir. 2024). These criteria apply to the franchise agreements attached to the Motion to Dismiss, and I will refer to them when appropriate.

could justify personal jurisdiction. *See id.* n.3. But the German company's officers were not defendants there, and the proposition for which Defendants cite the case appears nowhere in the opinion. Here, in contrast, MDR is a Pennsylvania company incorporated and headquartered in this Commonwealth, and the Individual Defendants allegedly negotiated the franchise agreements, which repeatedly claim the protection of Pennsylvania's laws. The Complaint sufficiently alleges that the Individual Defendants committed fraudulent acts as key officers of a Pennsylvania corporation which now argues for the protection of Pennsylvania's laws. Asserting personal jurisdiction over these officers does not offend due process.

Disputing these allegations further, the Individual Defendants attach "personal jurisdiction certifications" that offer conclusory recitations that each defendant did not seek out the protections of Pennsylvania's laws. *See generally* ECF 17-4. Such self-serving declarations add little value. If other aspects of the record support jurisdiction, Defendants may not secure dismissal simply by swearing that the Court lacks it.

Finally, the Individual Defendants point to contractual provisions purporting to waive any claims against the Individual Defendants arising out of the franchise agreements. *See* Mot. at 11-12. But this part of the agreements covers only "fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law." ECF 17-7 at 124. On its face, this provision appears to govern *contractual* duties, not waive claims arising out of all pre-contractual dealings between the parties.

*4. The Agreements' "comprehensive releases" do not bar this action's tort claims.*

Defendants next claim that the Plaintiffs' assignment agreements extinguished any claims held by the individual plaintiffs when they made the transfers. *See* Mot. at 13-16.[3] The flaw in this argument is that this provision does not bar claims that had not yet accrued at the time of the transfer. In general, Pennsylvania courts will enforce an unambiguous waiver of *all future claims*. *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733, 735 (Pa. 1989). The Third Circuit has also construed arguably ambiguous language as barring future claims where the court had no doubt that the parties meant to bar all future claims. *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 895–96 (3d Cir. 1975).[4]

Here, in contrast, the release does not bar all *future* claims. Rather, it bars all *unknown* claims. This important distinction involves the difference between an unknown claim and an unaccrued claim. In Pennsylvania, fraud claims "exist" when they accrue, and they accrue when

---

[3] According to Defendants, the releases all look substantially similar to that signed by Bauer Industries, stating that the parties:

> …release, acquit, and forever discharge the Franchisor Releasees from all obligations, claims, debts, demands, covenants, contracts, promises, agreements, liabilities, costs, attorneys' fees, actions or causes of action whatsoever, whether known or unknown, which [they] have, had or claim to have against the Franchisor Releasees through the date of this Agreement, including any claims or causes of action arising out of or related to the Transfer (and any assets associated therewith) and/or any other claims or causes of action under any federal or state franchising laws.

Mot. at 11 (citing ECF 17-10 at 3).

[4] In a parallel case against MDR and several of these defendants in the Southern District of Florida, that court found *Three Rivers* to be controlling and decisive in favor of enforcing the waiver against assignment. *See generally Labento LLC v. MDR LLC et al.*, No. 25-81535, 2026 WL 2187910 (S.D. Fl. Apr. 27, 2026). I am not persuaded and note that the release in *Three Rivers* explicitly included future claims, which this release does not. *See MDR United, Inc. v. Backporch Partners, Inc.*, No. 25-4532, 2026 WL 1658522, at *11 (E.D. Pa. June 5, 2026) (Hodge, J.).

the plaintiff knows or should have known about their possible viability through due diligence. *See Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005). An "unknown" claim is a claim that exists, and thus has accrued, even if the plaintiff has not realized it yet—as my colleague Judge Bartle analogized, "North America, for example, was unknown to Western Europe for centuries, yet North America existed. The unknown claims do not encompass unaccrued claims as the latter do not exist as claims." *Schaefer v. HPB Foam* LLC, No. 24-6298, 2025 WL 1888207, at *10 (E.D. Pa. July 8, 2025) (Bartle, J.). By barring only unknown claims, Defendants failed to bar claims that had not yet accrued. And Plaintiffs specifically pled that they were only able to identify the alleged fraud after the agreement was in effect—that is, they plead claims that are not covered by the waiver of merely "unknown" claims. It is a question of fact, inappropriate for resolution at the motion to dismiss stage, when Plaintiffs' claims did accrue—that is, when due diligence could have revealed the Plaintiffs' claims to them.

5. *Three of Gortz's agreements require arbitration.*

Defendants' last threshold argument is that Gortz's claims should all be arbitrated because some of her franchise agreements contain broad arbitration clauses. *See* Mot. at 33-34. Plaintiff responds that only three of Gortz's six franchise agreements contain arbitration provisions. *See* Resp. at 32-33.

Defendants are right that Gortz's agreements to arbitrate are binding and enforceable. In general, the Federal Arbitration Act requires courts to enforce arbitration agreements affecting interstate commerce where the contracts are valid under state law. *See* 9 U.S.C. §§ 2-4. Under this strong preference, Pennsylvania law construes arbitration agreements broadly, *see Borgia v. Prudential Ins. Co.*, 750 A.2d 843, 850-51 (Pa. 2000), and the Supreme Court of the United States has directed that "any doubts concerning the scope of arbitrable issues should be resolved in favor

of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Plaintiffs have not disputed any of these elements regarding Gortz's agreements that do contain arbitration clauses, so these claims must be arbitrated.

Conversely, three of Gortz's franchise agreements *do not* contain arbitration clauses. The Pennsylvania Superior Court has elsewhere held that arbitration agreements should not be read to reach beyond their contracts' four corners absent explicit agreement to do so. *See Emlenton Area Mun. Auth. v. Miles*, 548 A.2d 623, 625 (Pa. Super. Ct. 1988) (holding that arbitration agreements "are to be strictly construed and not extended by implication"). And the Third Circuit has applied this guidance to bar arbitration in cases much like this one, where two parties agreed to a series of related agreements, some of which required arbitration and some of which did not. *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 137-38 (3d Cir. 2004). Unless an agreement explicitly draws all related agreements between parties into arbitration, the court needs to strictly enforce the clauses where they are present but not extend them to where they are not. *Id.* The same holds here with Gortz's agreements. The parties have pointed to no language that would enmesh the non-arbitration agreements into those governed by such agreements.

As a result, Gortz's claims arising from the agreements that require arbitration will be stayed pending arbitration, but claims arising from the remaining three agreements will proceed.

*6. All the plaintiffs have satisfied the mediation precondition to litigation.*

Defendants also argue that Plaintiffs were all contractually required to mediate their claims before litigating them, *see* Mot. at 8–10, but that requirement has been met. *See generally* ECF 26 & 27.

**B. Plaintiffs' claims for fraudulent and negligent misrepresentation survive dismissal.**

*1. Plaintiffs' home states' laws will govern the tort claims.*

At the outset, the parties disagree about which state's law should govern each claim. Defendants assume the Pennsylvania choice of law provision in the franchise agreements should cover the fraud claims, while Plaintiffs insist it is more appropriate to apply the tort law of each of their home states. *See* Resp. at 11–12. I agree with Plaintiffs and will apply the tort laws of Virginia, Ohio, and Tennessee to Plaintiffs' respective claims.

First, the contracts' choice of law only applies to "[t]his Agreement." *See* ECF 1-3 at 50. The misrepresentation claims deal with the Defendants' actions before the agreements' formations, and as discussed above, I cannot at this point say that they were waived by any releases.

To find the proper choice of state tort law, a federal district court with diversity jurisdiction applies the choice-of-law rules of the state in which it sits. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). Where a true conflict of law exists between the states' laws, Pennsylvania courts weigh "the policies and interests underlying the particular issue before the court," *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964), and follow the rule of the state which "has the most significant relationship to the occurrence and the parties," *Melmark, Inc. v. Schutt by & Through Schutt*, 206 A.3d 1096, 1107 (Pa. 2019). Here, the answer for the tort claims will be the Plaintiffs' home states: Plaintiffs live there, negotiated from there with Defendants, and bought franchise territory there. While MDR is headquartered in Pennsylvania, none of the Defendants lived in or worked from Pennsylvania. Given these facts, Tennessee, Ohio, and Virginia will have clearer interests in seeing their laws applied in case of

any conflicts with Pennsylvania. *See also Flex Nine*, No. 25-5073, 2026 WL 1984115, at *17-19 (applying the same analysis for an MDR franchisee in Utah).

*2. Plaintiffs' fraud claims are not time-barred.*

Defendants next argue the tort claims are time-barred, both by the contractually-shortened statute of limitations and by Pennsylvania's two-year statute of limitations. *See* Mot. at 17-18. The first argument is unpersuasive given that the agreement applies to "cause[s] of action arising out of or under this Agreement." ECF 1-3 at 51–52. The fraud claims as alleged do not arise out of or under the franchise agreements, but rather in the negotiations that induced the contract, and Defendants make no cognizable argument otherwise.

Turning to the Plaintiffs' home-state statutes of limitations, each is plausibly timely. Tennessee gives three years for fraud claims after accrual,[5] Ohio gives four years,[6] and Virginia, like Pennsylvania, gives two years.[7] The statute of limitations is an affirmative defense, and an action may be dismissed under Rule 12 if the complaint on its face shows that the action is

---

[5] *See Fortune v. Unum Life Ins. Co. of Am.*, 360 S.W.3d 390, 401 (Tenn. Ct. App. 2010) ("Tennessee Code Annotated section 28–3–105, which the parties agree governs Fortune's allegations of fraud and misrepresentation, provides that an action for injuries to real or personal property must be commenced within three years of accrual.").

[6] *See Cundall v. U.S. Bank*, 122 Ohio St. 3d 188, 192–93, 2009-Ohio-2523, ¶ 24, 909 N.E.2d 1244, 1249 (Ohio 2009) ("Claims for fraud and breach of fiduciary duty based on fraud are governed by the four-year statute of limitations set forth in R.C. 2305.09, unless the claim is not discovered despite reasonable diligence.")

[7] *See Hansen v. Stanley Martin Companies, Inc.*, 585 S.E.2d 567, 573 (Va. 2003) ("[T]he two-year statute of limitations of Code § 8.01–243(A) applies and begins to run from the date the fraud or negligent misrepresentation "is discovered or by the exercise of due diligence reasonably should have been discovered.").

untimely. *Bethel v. Jendoco Const. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978). Such is not the case here.

*3. Plaintiffs pled fraud with sufficient specificity except as to Joshua Hoffmann.*

Defendants' next argument is that Plaintiffs failed to plead fraud with the specificity required by Rule 9(B) of the Federal Rules of Civil Procedure. *See* Mot. at 20–21. Specifically, Defendants count the number of times each Individual Defendant is mentioned, then assert that the Complaint cannot survive without specific quotations from the Individual Defendants or the Workbook. *See id*.

Defendants are correct as to Defendant Joshua Hoffmann, who appears nowhere in the Complaint's body. All claims against him will be dismissed.

Otherwise, this argument is unsupported. Rule 9(B) exists to protect innocent parties from the inherent reputational risk of being accused of fraud and to filter out frivolous claims. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). It does this by requiring plaintiffs to lay out the details of alleged fraud—the alleged fraud's "who, what, when, where, and how." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).

Here the Complaint says *who* spoke to Plaintiffs (the Individual Defendants), *what* they did (made false statements), *when* (during each stated time frame), *where* (remotely to Plaintiffs in their home states), and *how* (through oral statements, FDDs, and the Workbook). This is all Rule 9(B) requires. Defendants present no authority supporting their insistence that Plaintiffs need to refer to the Defendants some arbitrary number of times or give exact quotes from the Individual Defendants.

*4. The plaintiffs adequately pled justifiable reliance.*

Defendants also make a multipart argument that Plaintiffs failed to plead justifiable reliance, as required by Pennsylvania's fraud statute, which Defendants say applies. *See* Mot. at 21-28. Defendants point out that the franchise agreements contain integration and non-reliance clauses, stating that the written agreement contains the parties' entire agreements and that no statements by MDR or any of its representatives led Plaintiffs to enter the agreements. *See id.* at 22-23. Plaintiffs also answered "yes" to a closely related list of agreements. *Id.* at 23-25.

The problem is that each of Plaintiffs' home states precludes disclaimers from barring fraud claims. "Tennessee law . . . gives no effect to disclaimers in the presence of fraud or negligent misrepresentations." *Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.*, 869 F.2d 264, 268 (6th Cir. 1989). The Ohio Supreme Court has concurred that "fraud cannot be merged" and the parol evidence rule does not apply to preclude evidence of fraudulent inducement. *Galmish v. Cicchini*, 734 N.E.2d 782, 788 (Ohio 2000). The Fourth Circuit has ruled similarly with respect to Virginia. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 630-31 (4th Cir. 1999). Virginia's Supreme Court has gone further and held that "a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for recission of the contract." *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979). Given the controlling law, Plaintiffs' state fraud claims cannot be barred by contracts that the Plaintiffs contend are the products of that fraud.

Aside from the reliance waivers, Defendants argue the Financial Disclosure Documents necessarily defeat Plaintiffs' claims. *See* Mot. at 25-28. This argument fails because justifiable reliance is an inherently fact-intensive element, and the FDDs alone do not provide enough information to dismiss Plaintiffs' fraud claims.

*5. The economic loss doctrine does not bar the tort claims.*

Defendants' last argument against the tort claims is that they "attempt to recast a breach of contract dispute as tort claims," in violation of the economic loss doctrine and Pennsylvania's unique, closely related "gist of the action" doctrine. Mot. at 29. Both doctrines bar tort claims arising from a contract where there are no independent injuries in tort alleged. *See In Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) (economic loss doctrine); *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (gist of the action doctrine). But here, Plaintiffs' tort claims do not arise from the contracts but from the parties' pre-contractual interactions. In the governing states, pre-contractual fraud allegations are not subject to the economic loss doctrine.[8]

**C. Dismissal will be granted in part and denied in part on Count III – breach of contract**

Plaintiffs' breach of contract claim asserts that "after Plaintiffs opened their franchise, it became plainly apparent to Plaintiffs that MDR had sold a franchise opportunity to Plaintiffs without having the personnel, infrastructure, and resources necessary to fulfill the obligations owed to Plaintiffs under the terms of the Franchise Agreements." Compl. ¶ 53. Plaintiffs offer four specific breaches of contract as examples:

> (a) [failure to] establish national advertising and brand promotion in breach of Paragraph 3.7 of the Franchise Agreements;

[8] *See, e.g., Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 490 (Va. 2010) ("The fraud alleged by the [plaintiffs] was perpetrated by [the defendant] *before* a contract between the two parties came into existence, therefore it cannot logically follow that the duty [defendant] allegedly breached was one that finds its source in the Contracts."); *Eysoldt v. ProScan Imaging*, 2011-Ohio-2359, ¶¶ 19-23. 194 Ohio App. 3d 630, 636–37, 957 N.E.2d 780, 784–85 (Ohio Ct. App. 2011) (holding the economic damages rule does not apply to intentional torts); *Commercial Painting Co. v. Weitz Co. LLC*, 676 S.W.3d 527, 540 (Tenn. 2023) (limiting the economic damages rule to products liability claims).

> (b) [failure to] deliver the agreed upon video productions for use on social media, actors and actresses' compensation, and video editing in accordance with Paragraph 3.10 of the Franchise Agreement;
>
> (c) [failure to] provide effective digital marketing and website management despite collecting an ongoing Digital Management Fee in accordance with Paragraph 3.11 of the Franchise Agreement; [and]
>
> (d) [failure to] provide local SEO optimization during the first year of operations despite collecting a Local Brand Optimization Fee in breach of Paragraph 3.6 of the Franchise Agreement.

Compl. ¶ 54. Defendants challenge each of Plaintiffs' four breach of contract examples. First, Defendants argue that all the contract claims are time-barred based on the contractually-shortened one-year statute of limitations or Pennsylvania's statutory limitations period. *See* Mot. at 18–20. Second, Defendants challenge the merits of the contract claims, largely by insisting they never had the contractual duties Plaintiffs say they did. *See id.* at 28-29.

*1. Most of Plaintiffs' contract claims are not time-barred.*

Section 18.9 of the Franchise Agreements provides that no action may be maintained unless brought within one year after the act, transaction, or occurrence on which the claim is based, or the Franchisee becomes aware of facts or circumstances reasonably indicating a potential claim, whichever occurs sooner. *See* ECF 1-3 at 51–52. Defendants assume that "the transaction on which the claim is based" is each plaintiff's execution of their franchise agreements, and therefore any breach of contract claim of any kind had to be brought within the first year of each franchise's operations. Mot. at 18-19.

This argument lacks force for several reasons. First, as a matter of contract interpretation it is insufficiently clear that "the act, transaction, or occurrence on which the claim is based" is the

execution of the franchise agreement.[9] The term "act, transaction, or occurrence on which the claim is based" is ambiguous, especially when referring to ongoing contractual duties, and Defendants offer no discernable support for their preferred interpretation of it. Separately, many of the duties were ongoing obligations, and it may not have been plausibly apparent that Defendants were in breach until the year had run.

Finally, for most of the contract breach allegations it is no clearer on the contracts claims than on the tort claims when the claims arose—that is, when Plaintiffs could have discovered the breach through due diligence. This is a factual question, and I am compelled to resolve all inferences in the light most favorable to the plaintiff.

In all, the parties agree that the contractual limitations period of one year governs these claims, but the starting date and meaning of that provision, and the claims' timing within it, cannot be read the way Defendants insist, with one exception.

2. *Plaintiffs Bauer Industries' and THP Solutions' first-year support claims are time-barred.*

One of Plaintiffs' contract claims asserts that Defendants entirely failed to provide promised search engine optimization ("SEO") support in the franchises' first year of operations following the execution of the franchise agreements. Compl. ¶ 54(d). This provision lends itself to a clear deadline: the provision created an obligation during the first year of operations, and the Plaintiffs should have recognized that the promised support never came within one year of the end of their first year of operations. Per the Complaint, Bauer Industries and THP Solutions made their

---

[9] Defendants' Motion cites the Complaint for the proposition that "Complaint alleges the transactions occurred when the Franchise Agreements were executed." Mot. at 18. But the Complaint alleges no such thing explicitly, nor is there any implication of the Complaint's provisions that compels such an inference.

respective purchases in 2021. Based on the contractual agreement and the statutory time limit, their first-year support claims are time-barred. Gortz, however, entered its agreements in 2024, so this action's filing fell within a year of the end of its first year of operations.

*3. The rest of Plaintiffs' contract claims state claims for relief.*

Other than the first-year SEO support, Plaintiffs plausibly claim that they paid money for services that Defendant promised but did not provide.

First, regarding the "Brand Fund" support in Section 3.7, Defendants maintain that the contract does not require them to create the Brand Fund and separately gives them authority to "suspend or terminate the Brand Fund at any time." Mot. at 29. But the agreement copies suggest that Plaintiffs paid money for a contemplated service never provided. Section 3.7 and its analogs either claimed "Franchisor *has* established a national fund for advertising and brand promotion" to which payments were due, or, in the alternate, gave Defendants the right to "re-establish and administer" the fund. *See, e.g.*, ECF 1-3 at 12. Plaintiffs allege they paid into the fund, which by the terms of the contract suggested it either did exist or had been re-established. The pleadings clearly allege that Defendants made the payment for and operation of this fund part of the consideration for the agreement, accepting the Plaintiffs' money under false pretenses and failing to perform the promised services.

Regarding the Digital Management Fee, Defendants point out that Plaintiffs Bauer Industries and THP's franchise agreements do not contain digital management fee provisions, and in Plaintiff Gortz's agreement it is not Section 3.11, which Plaintiffs pled. *See* Mot. at 29. But Gortz's franchise agreement indisputably includes the Fee and Defendants do not dispute that they failed to perform under it. As to the other plaintiffs, their agreements may not identify the specific fee but contain other language that in substance is the same. *See, e.g.*, ECF 1-3 at 34 (in Bauer's

agreement, stating that "Franchisor will use the National Advertising Fund, in Franchisor's sole discretion, to develop, produce and distribute . . . advertising."); ECF 17-15 at 4 (including an optional Digital Management Fee in one of THP's agreements, for which at this point it is unclear whether THP paid or not).

In sum, Plaintiffs stated a plausible claim that Defendants breached promises to use remitted funds for digital marketing.

Finally, as to Section 3.10, the Creative Media Fund, Defendants merely say that "the allegation is unsupported." Mot. at 29. This argument is impressively laconic but carries no persuasive force.

**D. Dismissal is denied on Count IV – Tennessee Consumer Protection Act**

Defendant raises two objections to Plaintiff THP's Tennessee Consumer Protection Act (TCPA) claim: (1) that they are time-barred under the law's one-year statute of limitations and (2) that the law prohibits collective actions, including this one. *See* Mot. at 30-31.

First, it is once again not clear when the statutory clock began to run based on when THP knew or should have known the facts underlying his claim, and Tennessee's statutes specifically start the clock when a person discovers an unlawful act, rendering dismissal inappropriate. *See* Tenn. Code Ann. § 47-18-110. Second, the statute only bars class actions. *See id.* § 47-18-109(g). I will therefore deny the Motion as to this count.

**E. Dismissal is granted on Count V – Ohio Consumer Sales Protections Act**

Defendants highlight that Ohio's statute restricts its application to purchases "that are primarily personal, family, or household." Mot. at 31-32 (citing Ohio Rev. Code 1345.01(A)(D)); *see Culbreath v. Golding Ents., L.L.C.*, 2007-Ohio-4278, 872 N.E.2d 284, 288-90 (Ohio 2007). The Court of Appeals of Ohio has previously held that franchises do not fit within this description.

*See Yo-Can, Inc. v. The Yogurt Exch., Inc.*, 2002-Ohio-5194, 778 N.E.2d 80, 84-85 (Ohio Ct. App. 2002).

Bauer's response is unpersuasive. It argues that the cases cited above deal with interactions between experienced businesses, and that the statute calls on courts to consider all the facts of a given transaction to look for situations where individual consumers are unfairly deceived by more experienced businesses. *See* Resp. at 31-33. But Bauer cites no Ohio authority supporting this policy argument, and my responsibility as a federal judge sitting in diversity is to follow state law. This count will therefore be dismissed with prejudice.

**F. Dismissal is granted on Count VI – Virginia Business Opportunity Sales Act**

Finally, Defendants argue that Gortz's Virginia statutory claim is defective because the relevant statute excludes "franchises" from the definition of a "business opportunity." Mot. at 32-33. Gortz concedes this point, *see* Resp. at 31 n.5, and this count will also be dismissed with prejudice.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss will be granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge